I would like the lawyers to state their names for the record. We'll probably give you each 10 minutes for your argument and then five minutes for rebuttal. We don't usually watch the clock, so if things seem to be going well and we have more questions, we will continue, but that's usually the time frame that we use. As you notice, Justice Hoffman is not here today. He's hearing cases for the Industrial Commission. But rest assured, he has read the briefs and will be listening to the argument that we have before us today, so we'll be well-versed in what's happening with the case. So, ma'am, would you call the case, please? 11-0231, People v. Christopher Kroneberger Thank you. Lawyers, identify themselves for the record, please. You can just stand at your place. Todd McHenry, representing Christopher Kroneberger. Mr. McHenry, thank you. Constance Dix, representing Ms. Collins. Ms. Collins. Will you be doing all the arguing today, counsel? Yes. All right. Thank you very much. Please be seated. Mr. McHenry? Thank you. All right. Mr. McHenry, are you ready to go? May it please the Court, as I mentioned, I'm Todd McHenry and I represent Christopher Kroneberger. The Miranda rights are designed to do one thing, to give a suspect some degree of control in an otherwise inherently coercive environment. Christopher, on three occasions, attempted to gain some control during his interrogation leading up to his inculpatory statement. The detectives took that control from Christopher by repeatedly failing to honor his right to remain silent that he invoked twice, and then ultimately by undermining his invocation of his right to have an attorney present during questioning. Counsel, can we talk first about what the standard of review on a motion is for us, as far as the factual findings of the trial court are concerned? Factual findings are given deference. The ultimate legal conclusion is de novo. Additionally, since the material in this case has been recorded pursuant to statute, it is de novo review of what is actually on the videotape, so no deference is owned to trial court's conclusion about what's. And this trial court went through a pretty lengthy discussion of the facts. Did the trial court not do that? The trial court did go through the facts. However, the main emphasis that the trial court used was pointing to, well, was Christopher talking at this time? Was he talking at that time? The trial court completely overlooked the first invocation of the right to counsel, and then during the second one, the trial court came to the conclusion that, well, that was the closest thing that he had done to invoking his right to remain silent. But that invocation was, I mean, under Illinois law, Christopher definitely invoked his right to remain silent when he was asked by a detective, are you done talking to me? Are you done talking to all of us? So it was crystal clear he said, yeah. A one-word answer under People v. Brown is sufficient to unequivocally invoke your right to remain silent. That's what he did. Brogan immediately went on and interrogated him. And not only is this a failure to scrupulously honor case, because that's just, I mean, the police are violating the Miranda rights simply by talking at that point. But not only are they just talking, but they're aggressively attacking the right to remain silent and the right to an attorney by threatening Christopher repeatedly and trying to induce him to make a statement after he's already indicated that he doesn't want to talk. The first invocation at 1257, he's asked by Officer, I'm sorry, leading up to that, it's important just to contextualize things, Christopher had a year earlier, before this interrogation, he'd been interrogated in connection with this case and he asked for an attorney. And that ended things at that point. In this case now, they know that they have a suspect who is likely to ask for an attorney. He's done so before. So the very first thing that they do in the first 33-minute portion of the interrogation with Detective Nolan and Murray present, they start to undermine the ability to ask for an attorney. The other side of what you just said is he had done it before, so he was no stranger to this process. He knew that if he invoked the right to an attorney, that they would have to stop questioning him because he had done it a year before. So how is it that he suddenly didn't understand the process a year later? I'm not arguing that at the beginning he didn't understand the process. I am arguing, though, that, I mean, that same fact goes both ways because the fact that he was able to in another interrogation exercise those rights, and then in this time he tried three times to invoke his rights and was unsuccessful in doing so. It shows, you know, what's different. Well, in this case, they were threatening him. They said, well, first they started off by trying to induce him to talk by saying it's time that people can do certain things to lessen the load. At 1257, which is what you talked about the first time, at 1257 did he say, I want an attorney, I don't want to speak to you? That's not what I saw in the record. What did he say at 1257? That's correct. He didn't say that. What he said was, first they asked him specifically, you want to keep talking? He shakes his head side to side indicating no. They ask, you don't want to talk anymore, we're done talking? He affirmatively nods yes. What's important is not so much, you know, one factor that we have to look at under people versus Nielsen, the officer's understanding, because the officers are in the room. They know what's, they're the closest to it. They're closer than the camera. Murray was the closest detective. He knew Christopher invoked the right to remain silent. That's exactly how he understood it. And he ultimately said, I can't force you to talk. But then he went on to try to walk him through what would be involved in reinitiating contact with the police when he told him, but I'll be in periodically and if you want to talk to me, I have no problem with that. And then he says a few sentences later, I really thought you were going to, I'm looking forward to talking to you because I really thought you were going to do the right thing. There's no case law that I'm aware of that allows a police officer, after you've invoked your rights, to try to persuade you that it's not doing the right thing if you invoke those rights. So once the invocation happened, they failed to honor those, they certainly failed to scrupulously honor them. So which time, which invocation are we talking about now? That was just 1257 and then the next one comes at 207, but there's, you know, a volume of material in between there because Detective Bush, after the first invocation, so 1257, the invocation happens, seven minutes later, Detective Bush enters under the guise of asking ministerial questions. But let's go back to 1257 for a minute because it's, you know, from the record and from, it's hard when you're reading the record and you're reading the depiction of this, but slight head movements and nodding, is that, in your opinion, unambiguous and unequivocal invocation of right to remain silent? In concert with how the officer understood it, yes. In People v. Nielsen, the defendant put his hands over his ears and said, nah, nah, nah, nah, nah. He understood that, and the Supreme Court said that was a clarification. I think that's a little bit, you know, I think even a young child understands that if you put your hand in your ears and you're saying, nah, nah, nah, nah, I'm not listening, it means that you're not listening. A slight nodding of the head or just bowing head movements and saying nothing, I mean, is that unequivocal and unambiguous in your opinion? Yes, in the sense that he did it twice. So we're not just talking about one nod of the head or one shaking. He shook his head indicating that no, he did not want to talk. He nodded to, are we done talking here, saying yes. So the two things back to back and then the officer clearly understanding that he had invoked his right to remain silent said, well, you know, I can't force you to talk. And then he kept going and kept infringing upon his right to remain silent and failed to scrupulously honor it. Bush, when he came in, at the suppression hearing, Bush even admitted at first that he was told that Christopher refused to talk, and then he tried to backpedal from that statement and he said, well, it's not so much that he refused to talk, it's that he wasn't telling us the truth. And then a page later on the transcript, Bush admits, well, my questions were designed to infer why did you refuse to talk to us. Counsel, does I do not want to talk equate with I want a lawyer? I don't want to talk doesn't equate with I want a lawyer, but when he is asked at 210, do you want a lawyer, and he says, yeah, that is certainly an invocation of the right to counsel at that point. And when he was asked at 207, you're done talking to me, you're done talking to everyone, and he says, yeah, that's a clear invocation of the right to remain silent. So these rights are repeatedly invoked. It's on the video. The case law indicates one-word answers are sufficient. So if he indicates yes or a no, that's sufficient under Illinois law to invoke your right to remain silent or your right to an attorney. But doesn't it have to be clear, unequivocal, unambiguous, and as you pointed out, this defendant was no stranger to the process. He had been arrested or at least in custody before. He had been asked questions and he invoked his right to a lawyer, and he knew that that cut off the questioning. So in the interim of the year time that happened between his first, when he was first brought in and the second time, he forgot that he can say I want a lawyer and it will stop. At no point am I reading this where he says, no, I don't want to talk to you and I want a lawyer. Those two things were never said together as far as I can read in this transcript. So are the police officers supposed to infer or put it together? I mean, Brogan at 207, he asked him, are you done talking to me? Are you done talking to everyone? Yes or yeah. That's a clear indication of the right to remain silent. Okay, that's a clear indication that he's done talking according to you. How does that equate to and I want a lawyer? Well, at 210 when he's asked, do you want a lawyer, and he says yeah. So if you ask someone if you want a lawyer and you say yes, that's an indication of the right to an attorney. He further clarifies that a few moments later when he says. He was talking to so many different detectives. Who did he say at 210, who did he say he wanted? Detective Brogan. And at 207, he told Detective Brogan, he answered yes to are you done talking to me? Are you done talking to everyone? Those are clear indications of his rights. And in this case, even irrespective of whether he invoked or not, I mean the difference in this case, back to your question, Justice Cunningham, the difference between a year earlier and this case is Detective Nolan and Murray in the first knowing that he's likely to invoke his right to an attorney, they begin by saying there are things that people can do to lessen the load. It can be the difference between a life sentence or a term of years. They say that Murray says I personally would love to go before a judge in a black robe and personally vouch that yes, I know Christopher is not the shooter. So Christopher in his mind is thinking maybe so. Like maybe if I am just not the shooter but somehow involved, I can lessen my responsibility at that point. So he's not. That's why he's being, you know. So let me ask you another thing. How do you describe scrupulously honor? They didn't scrupulously, what is your understanding of scrupulously honor the defendant's right to remain silent and to have an attorney present? From these facts, define it for me. Any continued questioning of the defendant either about the case, you know, like Bush did, you know, or about invocation itself. So if I invoke my right to an attorney, a right to remain silent, and then an officer says, well, why do you want to do that? That's not really the right thing to do. That's not scrupulously honoring. So the standard is very high. Unfortunately, I mean, in this case, it is a particularly egregious version of failing to scrupulously honor because you have threats and coercion. I mean, Brogan comes in and says, you're going to swing for this if you don't talk. If you say no, you're not knowing what happened or not being involved. You're cutting your own throat. You're spilling your own blood. You're going to hang for this. I mean, these are coercive statements. It's akin to a threat of violence. And, you know, we know under U.S. v. Rogers, a threat of violence threatening the death penalty increases the likelihood of a false confession to the point where you can no longer trust if the statement is actually accurate versus just saying what you think is necessary to try to avoid this consequence. Counsel, is there any room for persuasion or cajoling by police officers when they're interrogating people like this? The law allows for some amount of deception. Like an officer can tell someone, you know, we know so much about you, even though they don't. They can say someone said something about you, even though they didn't, in general. I would say there's a difference, though, if once the person invokes their rights and then you're using deception that's talking about the rights themselves, that then belies the actual rights. That's what State v. Luckett, the highest court out of Maryland, 2010, came to the conclusion that, you know, you can in one breath say all the rights perfectly to remain silent rights of attorney, all of them, and then, you know, minutes later say, but you don't really need an attorney in this context because, you know, we can talk about a separate matter, which is not true. Any statement you make can be used against you and you have a right to an attorney at that point. Counsel, as far as the nullification issue, Luckett's a Maryland case. Correct. Yeah. And wasn't that a hugely different case as far as the facts? Isn't the officer given an incorrect interpretation of what the law was in that case? I don't think that that's – I'd say that they're very similar based on that point because Brogan tells Christopher, your silence is making you look like a dirty gangbang MF. That is specifically talking about one of the Miranda rights. It's inconsistent with that right. Also, when they're talking, and ultimately at 210, when Brogan first says, you know, do you want a lawyer, and Chris invokes one, and then Chris asks, I don't understand why I can't have one with me here, basically during questioning. It's clear at that point he's not just asking for an attorney, he's asking for one to be present during the actual interrogation, which he is allowed to do under Miranda. So when Brogan correctly first starts to say, well, I can't talk to you because you've invoked your rights, that part, if he had stopped there, then he'd done everything he should do in that situation. But he went on to repeat the theme brought up in the earlier part, whereas you're either here to help yourself or no one's helping you at all, basically again saying this is your one chance for a reduction in sentence. That exact words that Murray used earlier in the interrogation was, if you ask for a lawyer, this whole thing stops and there's no more chances for a reduction in sentence because no ASA is going to look at this and offer you a reduction down the line. So that's why he's being so, you know, why he's trying to be careful not to shut down the questioning because he's believing that maybe he should say something to the police, but he wants to do so with a lawyer. By them saying basically, well, you can't really invoke your right to a lawyer and have them present here because that's never going to happen. Whether that's a true response or not, that completely undermines the right to have an attorney present during an interrogation. So back to Justice Conner's question regarding, is there any room for what we'll call persuasion and what you call coercion and I'm sure what the state calls persuasion as well. I mean, in all of these cases, the detectives are trying to get information from the defendant. Is there any room and what's the line between coercion and persuasion? What are the detectives allowed to say versus? Is there a bright line test for this? I think without painting a bright line for all cases, if we look at just this case and where I would draw the line, what was said to Christopher in the very beginning, those insinuations like, you know, there's certain things people can do to lessen the load, it's a difference between life and a term of years and all those things that are trying to induce him to talk. You know, those things are coercive. There's a certain amount of deception to it, obviously. What's the only case that says that that's coercive, counsel? What's the only case that says that that's coercive? Which part of that? Which threat? This will lessen your... Lessen your load. I mean, the threats of leniency. So if you promise leniency, I don't have the case site right here, but it's, I mean, it's black and white law that where you provide leniency, that goes on. If you look at U.S. versus Rogers, that's not an Illinois case, that's an Eastern District of Wisconsin case, I believe 2002. They talk about it as being on a continuum where a slight amount, like deception saying, you know, yeah, we know all this about you when they really don't. That's probably going to be fine. On the other end, once we get threats against you, like you may get the death penalty or you may get a difference between a life sentence versus term of years, then you're no longer letting somebody voluntarily, knowingly, and intelligently waive their rights, their Miranda rights. And in this case, going back to your question, Justice Conningham, when the bright light in this case for me is once he's invoked his rights, they clearly understand he has on two occasions, and they continue to threaten him and coerce him. We know from Miranda the whole reason in having the rights is to limit the coercive atmosphere of the interrogation. So they've blown right past that. So under that reasoning, once he shook his head or nodded his head at 1257, they should have stopped talking to him completely, unless they're asking him things like, do you want to go to the bathroom? Once Murray understood. However, I will say, if Christopher himself is asking, which he does at various points, if he asks a question like, I don't understand why I can't have an attorney here, I think it is appropriate for an officer at that point to say, basically, you can have a right to an attorney. They can answer to that and try to stop it where Brogan first started in his response. But he went on. He went on and said, but that will never happen, because this is what a lawyer is going to tell you. So he's speaking for all attorneys. He's limiting the options, and he's undermining the right to have an attorney,  Would you have anything to say if you had an attorney? So that's completely undermining it. But that in and of itself is almost like he's telling the defendant, you know, if you want to talk to us voluntarily, you can't have an attorney here. If you don't want to talk to us voluntarily, have an attorney here. I'm not sure how I understand why that's coercive. It's coercive because the Miranda rights themselves under Florida v. Powell, the police have to tell you, you have the right to have an attorney present during the questioning. So that is a Miranda right itself. So he is, in effect, telling them, you do not have the right to have an attorney during questioning, because that will never happen. So that is inconsistent with the right itself. What will never happen? An attorney will never be here with you during questioning. Counsel, can I ask you about what happened in the transport vehicle before they got to, I think it was Area 1. Yeah, from West Lawn to Area 1. Right. Was there testimony at trial that he was given Miranda in the car, and he spoke to the officers in the car?  Right. And he denied that, did he not? He denied getting Miranda warnings, but he admitted that he had a conversation with them in the car. And does that impact on this analysis at all? I think that the way that that factors into this is you have to look at the totality of what was on camera versus what was off, and look at Bush's response. So you have Christopher testifying that they were asking the questions, and then you have Bush saying he was volunteering, and we were telling him, no, no, no, don't talk yet. Wait until you get to Area 1, and you can talk to them, and you can tell them. Then, of course, when the cameras are rolling, that is absolutely not the demeanor that you see Christopher. He is not looking to tell his story to anybody at that point. They are frustrated. They are trying to coerce him, because they are saying, you know, he is saying basically, no, I don't know, no. He is giving these sort of answers. He is not giving one substantive answer to anything that happened during the incident itself. And that seems very, very odd for somebody on Bush's account, where he testified at the hearing that, oh, Christopher is just, he wants to talk to everybody on the way there. And then he gets there, and all of a sudden he doesn't want to talk. Bush also incredibly testified that, you know, he gave him his Miranda warnings when he took him down to be booked. It makes no sense for Bush to give him Miranda warnings in that context, where Bush thought that he had invoked his right to remain silent at 1257, and Bush came in. He didn't give him Miranda warnings then, and he thought that he had invoked one of his Miranda rights. He had every opportunity to do so, never did it. When Brogan came in, after the cameras come back on, and Christopher is now up from booking, and he starts talking, Brogan is sitting there with him and talking to him, and he never once gives him the Miranda warnings. They wait until he makes an inculpatory statement, and then they give it to him on tape. If Bush was concerned about his rights off camera, that is certainly inconsistent with the fact that he steamrolled it over them when he was on camera. It makes no sense. Well, you've been very diplomatic in basically saying that the testimony of the police officers before the judge at the hearing was incredible. But given the standard, you know, basically the defendant says one thing, all these officers are saying another thing. The judge is listening to this, and he makes quite extensive findings of fact from the hearing, as Justice Connors pointed out. What are we to do with that? I mean, we're not listening to the hearing, and there's this, you know, we have a standard of review. We're an appellate court. We're not the trial court. We get to decide whether or not the trial court got it right or not. So what's the standard of review? What do we do with that? Our argument is that everything that was on camera, just looking at what happened to him, how they failed to scruple his honor, how they threatened him. What we're saying is that anything that happened in that hallway, whether Chris reinitiated, whether Bush reinitiated, or whether he continued the interrogation at that point, the fact that he had been coerced to this degree, and they failed to give him that safety mechanism that Miranda allows, and they told him you're going to swing for it if you don't tell us something, anything that happened in that hallway cannot be but the product of the coercion and the intimidation that he had just experienced. So irrespective, this court can certainly say, irrespective of the fact of the findings of the trial court, the trial court missed the first two invocations of his Miranda rights. They missed the fact that police were failing to scrupulously honor. They considered them. They didn't miss them. They did not conclude that he had invoked any of his rights prior to the lawyer. It was discussed. The court didn't ignore it. But it's a big difference in that it changes how we view the coercion in the room, the pressure on Christopher, because that's the whole reason for scrupulously honoring. If we allow officers to steamroller over your rights, and then 10 minutes later if one concludes that Christopher reinitiated, then it provides every incentive for them to just walk all over your rights, because if they can take you out of the room and off the camera, which they're required to record the interrogation, and then they can say, well, you know, you invoked, you re-invoked out there and bring you back on camera, then all of these threats are then legitimized. I mean, it cannot be, I would say that with great caution should anybody set forth law that says that the police can tell you that if you ask for an exemption, you have no more chances for reduction in sentence. Plus, you know, you're going to swing for this if you remain silent. You're cutting your own throat. You're spilling your own blood. I mean, he used every possible version of, virtually every possible version of the death penalty that there is. So to do all these things and then to look at what happened in the hallway and to divorce it from all those factors is inconsistent with the black law case law saying that in determining whether he voluntarily waived his sentences, and that's everything that's on that video is taken into account. Is it just the video? It's a totality of everything. So what I'm saying is, yes, it's before, it's during the video. However, I would say there is certainly enough, all these threats on video is enough that, I mean, the State cannot at a suppression hearing meet its burden to show that he was not coerced into making that statement. Why do you say that the trial court missed the two implications? He obviously considered it. He just didn't agree with your argument. So why is that a miss? I'd say that she missed the first one because all she says is, well, he's talking before this, he's talking after that. The first one she completely misses, the ones that are just behavioral, and she misses the fact that the detective himself understood it to be the right, invoking the right to remain silent. And then on the second one, what she missed was the, I mean, the legal conclusion. She said, well, this is, she said, this is the closest thing that comes to an invocation. However, under People v. Brown, a one-word response, when you are clearly asked, you know, do you want to continue talking? And in this one, Brogan even made it more egregious because he clarified, are you done talking to everyone? I mean, there's been case law where it's not clear where, okay, if I ask you, are you done talking, does that mean you just want a break or whatever? He's saying flat out, are you done talking to everybody, all of us? And he says, yeah. Now, under People v. Brown, this Court's opinion, that is absolutely a clear and unequivocal invocation. The trial court missed it. It's on video, and it changes everything that happens after it. All the, which, I mean, even in and of themselves, if you threaten somebody to say you have to talk and tell us another version or you're going to get the death penalty. I'm still trying to understand why you said the trial court missed it. It seems like she considered it, but she did not agree or conclude that that was a clear and unequivocal, unambiguous invocation of his right to remain silent and to have an attorney present. That's what I, that was the takeaway I got. The important thing to draw, though, is back to the standard of review. This Court owes no deference to what's on the video. So this Court has to look at, okay, he said this by the officers, and then he responds this way. And under Illinois law, what does that mean? Under Illinois law, it means he invoked his rights. So the fact that the Court incorrectly concluded that he had not, this Court owes absolutely no deference to that erroneous conclusion. Is there a death penalty in place when this man was interrogated? There was the death penalty. It was still in the books at this point. So, again, and the prejudice that flows from all of this, we didn't, and I'll just briefly mention because we didn't get room in the reply to address it. One other evidence other than his, the defendant's inculpatory statements, and I think we can all agree that that is, everyone agrees that that's pretty powerful evidence for any trier of fact, whether it's a jury or a judge. Other than that, the State, what other evidence did the State have that you feel would have just been blown away had this inculpatory statement not been put before the trier of fact? Well, they had two witnesses. One of them was a drug addict who, at the grand jury, implicated Christopher, and then he recanted all of that testimony. You had his version of what happened, and then the State has David Pina's version of what happened, a young man who has implicated himself in the crime and had every reason to try to mitigate his responsibility. So those were the only other two things other than the defendant's statement? They had phone records. There was a phone. They had sort of like a third-party connection of a phone to Christopher, and they had phone calls going to the victim. So they had some circumstantial evidence in addition to the defendant's confession? Correct, and the standard is whether or not there's a reasonable probability of a different outcome. In this case, this was certainly the star piece of evidence. The video was played to them, played to the jury during the trial repeatedly. It was played in closing arguments and rebuttal six or seven times. It was then the jury sent a note during deliberation saying that they wanted a transcript, but then ultimately what they were allowed to watch during deliberations was the video itself. So the video was the highlight of it. You take this out and you have circumstantial evidence that certainly provides a reasonable probability for a different outcome in this case. For these reasons, we ask this Court to reverse and remand for a new trial. Thank you. Thank you. Ms. Collins. Good morning, Your Honors. Good morning. Again, Assistant State's Attorney Annette Collins for the people. Defendant attacks his confession on multiple grounds. Ms. Collins, why isn't the shaking of his head and the no, he doesn't want to talk anymore, why isn't that a clear and unequivocal indication that he's done talking? Because in the context in which it appeared, first of all, the shaking of the head was not emphatic. It wasn't the way. Wait a minute. What do you mean by that? He had his head down. There's only a slight movement on the tape. Even the trial judge, she noticed it, and she didn't miss this alleged invocation. What she said about that tape is true. What she said was the officer is asking him, does he want to talk? Does he want to keep talking, yes or no? He doesn't respond because he didn't respond verbally at that time. And, in fact, the most that can be said about defendant at this point in time is that he might be invoking. But as we know from our case law, that's not enough for an unequivocal, clear, unambiguous invocation. And, in fact, the only case that defendant offers is People v. Nielsen. Okay, that was that time. What about the next time when they asked him, was he done talking, and he said, yeah. Again, we can't look at that in isolation because my point to this court is the defendant tries to pick out pieces of the tape in isolation without considering the context. And, again, he does that with this scenario. That occurred at about 2.07. Earlier, at about 1.57, Detective Brogan was interrogating defendant, and defendant kept saying, I didn't do nothing to nobody. Detective Brogan asked him a couple of other questions. He kept saying, I didn't do nothing to nobody. Detective Brogan then said, ever in your life? And defendant still said, I didn't do nothing to nobody. So Detective Brogan says, I'm going to give you some minutes, and leaves the room. After 10 minutes, he checks in, puts his head in the door, and asks defendant, do you have to use the washroom? Defendant didn't even respond. So Detective Brogan then says to the defendant, are you done talking to me? Are you done talking? And that's when defendant says, yeah. It wasn't about Miranda's silence. It was just about being done talking at that time. And there's multiple cases that recognize that even a straightforward answer about being done talking doesn't necessarily invoke Miranda's silence. Let me ask you the same question I asked your opponent. What is your definition of the term scrupulously honored as used in the context of this interrogation of this defendant? Where there is a clear, unequivocal, unambiguous invocation, police have to stop questioning him. In your opinion, that never occurred at any point throughout this interrogation? There was one invocation in this case. It occurred at about 2-08, 2-09. And that was after the defendant had said to Detective Brogan, I don't know why I can't have somebody, I don't know why I can't have a lawyer here with me. And Detective Brogan says, you want a lawyer? Is that what you're asking for? And the defendant said, yeah. At that point, when he said, yes, I want a lawyer, to Brogan's question, that's an invocation. And what Brogan did at that point was exactly what he was supposed to do. He left the room and left defendant alone for 40 minutes. That's clear on the ERI tape. Defendant is just sitting alone in that room. It was only then, after he was being brought down for booking procedures, that defendant obviously changed his mind and wanted to talk to the detectives. Well, your opponent said that it's very suspect that when he's on camera, he's invoking his rights, and when he's off camera, is when the detectives claim, oh, that's when he said he wants to talk to us. What do you say about that? Because it is a totality of circumstances. Absolutely. It's not suspect. We have an entire body of case law built around the concept of re-invocation. I'm talking about this particular case. But what I'm saying is re-invoking or re-initiating contact with the police is not outside the realm of possibility. It doesn't happen. I'm just specifically talking about off camera versus on camera. That was Mr. McHenry's point, that the invocation of the rights according to the detectives, when he decided that he would talk to them, that's captured. That's not captured. That's off camera. And then when he's back on camera, somehow that's not captured. Your Honor, it's a credibility contest, frankly. And the circuit court believed Detective Bush when he testified that this is what happened. And if we take a look at the totality of the interrogation, it becomes even more believable. You know, in all of these suppression cases, isn't it a credibility contest? But we're an appellate court, so we get to look at all of this de novo and say either the trial court got it right or they got it wrong. That's our job. So I know it's a credibility contest, but what are we to do with that? I think that point is something that you have to address. If we take a look at the entire exchange on the video, it becomes very clear that Defendant had a rapport with Detective Bush. Remember, Detective Bush was the one who drove him to Area 1. When Defendant got into Area 1, he was met by Detectives Murray and Detective Nolan. Detective Murray and Nolan were the same detectives that had earlier had Defendant in custody in January. Defendant did not get along with those two men. As he later explained to Detective Bush, he thought they were looking at him like he was dirt. He didn't want to talk to them. He didn't like them. He felt as if they were judging him. So it's not unusual or strange that Defendant would reinitiate with Detective Bush, the one detective officer with whom he felt he had a rapport. So it makes sense that when he was brought down to booking with Detective Bush, that he would say, I've changed my mind. I want to talk. And frankly, nothing that any of these detectives, Brogan, Murray, Nolan, Bush, said before this reinitiation infected it or caused it. There was never any promises of leniency in this case. Counsel, as far as the totality of the circumstances, we're not only looking at the video, correct? Right. We're looking from the time he was picked up, again, somewhere in the suburbs, to the time he was brought down. Correct. So what time frame are we looking at here? Do we know how long he was in the car with the police officers? Do we know how long totally he was in the station before things ended, sometime at 3 o'clock in the morning? We know he made it to Area 1 a little after midnight, about I think 12, 20-something is when the tape starts. We know that he was brought immediately to the interview room from the car. We know he was picked up in Westmont, and I believe he was at the Westmont Police Department when Nolan, excuse me, Detective Bush and Big Ain picked him up there. So that time frame, I mean, given that time of night and given the distance, one could estimate that he was picked up sometime that night around 11 p.m., brought to Area 1 and interrogated, reinitiated around 3 o'clock, and then provided a confession at 3.30. So it's not a lengthy detention. And, in fact, there's no point where the defendant's demeanor changes in response to these alleged coercive statements. His demeanor throughout the tape was, to say the least, resigned and downcast. But that's not because he was being badgered or coerced. Defense counsel tries to say that, oh, he invoked in January, so therefore we would expect that he invokes here. Let me ask you something about the 3.30 a.m. confession. Did Detective Murray provide only partial Miranda warnings at the beginning of that interrogation? There's never been a problem with the Miranda warnings. And in this case, what the defendant points to as far as being the correct partial Miranda warnings is that he points to only 12 o'clock, the first part of the interrogation. He doesn't challenge the Miranda warnings that were given during the confession. But I'm asking you that question because the 3.30 a.m. statement is the statement that's an issue, and that's the one that everyone saw and so on. So was that a complete Miranda warning as far as you know? That's what Bush testified to, that it was complete. What does the videotape show? The videotape doesn't show any Miranda at this exact point. The videotape shows Miranda later on, and it's absolutely in full. The Miranda that defendant challenges is the one that comes early. I know, but my question is specific. There's no problem with that Miranda. And defendant makes a big point of juxtaposing the earlier January custody with this and claims that since defendant knew how to invoke then, it's assumed that he should have invoked this time. There was a vast distinction between January and December, and it was the amount of evidence that the police had against the defendant. And, in fact, the police were absolutely straightforward with the defendant. Other than the videotape confession, which I think we can all agree is pretty powerful evidence, was the other evidence so overwhelming that it wouldn't have made a difference whether he confessed or not? Absolutely. And the reason I can say this, and even the closing arguments bear this out, because the confession wasn't even discussed by the state's attorneys until the last part of their evidence recount. We had evidence that showed the confession was put before the jury many times, and the jury even asked for it when they were deliberating, so obviously they thought it was important. Justice Cunningham, the jury didn't actually ask for the confession. The jury was confused about an instruction that talked about a transcript. The jury never had received a transcript, so the judge and the parties understood that question to be the jury's confusion, so what they did was they provided just the video to the jury. Okay. But the jury got to see the video again. Absolutely. And we don't have any dispute with that. But the remainder of the evidence was exceedingly strong. First of all, as defense counsel mentioned, we had Imo Kosala's father's grand jury testimony against him, which was consistent with what had occurred during the offense. He could have only learned that by somebody who was at the offense, which was defendant. What did he testify to at trial regarding his grand jury testimony? He recanted his testimony at trial, and the jury did not believe that recantation. That recantation was, to put it mildly, somewhat ridiculous. So in the context of not having a confession, see, I'm still on that point. Like if they didn't have the inculpatory statement, and this witness who your opponent says is less than credible recanted his testimony at trial, would you say that would make no difference? We have, in addition to that, we have an eyewitness to the offense who was also there during the offense and part of it. So his testimony. But he was a part of the criminal element himself, wasn't he? Right. And the fact that he is putting himself at the crime at the same time lends credence to his account of the crime. The fact that he's putting himself there as part of the individual who was burning the car after there was a gunshot, we know he was at the scene because he was seen leaving the very park at the moment that the fire and the smoke was seen by a completely disinterested witness. So we know we have physical corroboration that he was there. We have his entire testimony. We have defendants' phone calling the victim. We have the victim setting up a drug deal with Emil Kozula, the co-defendant. We have the victim's coworkers who saw the victim with Emil. And at the time that the victim was with Emil, defendant's phone was calling the victim's phone. We have the victim leaving to engage in this drug deal, and then we have David Pina's account of how defendant and Emil Kozula together had gone up to the victim and while the defendant was getting something from a glove box, the co-defendant shot the victim. Some of these people are testifying that Emil shot him. Defendant says Emil shot him. Certainly Emil's father said it was defendant that shot him. My question really went to, without this confession, when you have this other evidence, are you saying that it was so strong and unequivocal that the jury would have convicted him no matter what? Yes. Is that your argument? That's what we're saying. But again, that is our last alternative argument, Justice Cunningham. Our argument is that there was no invocation here, that that confession was properly admitted, that there was no promise of leniency, there was no coercion in this case. The defense counsel makes a lot of remarks and paraphrasing of the detectives claiming they said certain things about we'll give you a deal and so on. That doesn't appear in the transcript. He's paraphrasing. And when he complains about the detective saying to the defendant, you're going to swing, you're going to stick a needle in your arm, you're going to cut your throat, those were idioms. They were not meant literally. There was no reference to capital punishment here. There was no threats of capital punishment. But if you're saying to a person who's in custody for a murder, you're going to swing, I think we can all agree that that doesn't mean it's not a swing like you go to a park and a child swings. It's something else. No, I know that, Your Honor. That's what I'm saying. It was an idiom. In fact, the context of that statement, Detective Brogan was telling defendant, if you want to give your account, if you're not the shooter, what you have to do is you have to tell us because all we have now is an account from the other witnesses. Wasn't he suggesting, though, there would be some deference if he did give that confession? Was that appropriate? There is actually nothing in the transcript that shows that they were going to do something for him. There was no precise promise of leniency or anything of that sort. And, in fact, defense counsel, I believe Justice Connors, you asked him, is there a case that says offering leniency is improper? And I would submit that a decision by Justice Cunningham, People v. Lee in 2012, says that if there's going to be a complaint about a promise of leniency, it's only improper if there's a specific promise. It has to be specific. I'm going to give you X, Y, Z in exchange for your confession. That didn't happen here. So promises of leniency are not in and of themselves improper in an interrogation or statements to the defendant that help yourself because that's really, when we take a look at the entirety of this interrogation, that's what these detectives were saying. They presented the defendant with everything that they had against him. They told him, you're not going anywhere. We've got you for this murder. We have evidence from other witnesses that you're the shooter, that you are the stone-cold gang-banging MF-er. And if you want us to believe that, by all means, don't tell us otherwise. But if you want to mitigate it, if you want to tell us that this is not true, you have to tell us this. We can't get that information from anybody but you. There's nothing inherently coercive about that. That's what police officers do. These police officers continued to tell the defendant that they weren't there to help him, that they only wanted the truth out of him, and that only he could provide it. But they reminded him that if he wanted an attorney, he could get one. And that's why the police officer, Detective Brogan, left the room when the defendant requested a police officer. So rather than nullifying Miranda or undercutting it, they vindicated it by leaving the room and leaving the defendant alone for 40 minutes. Counsel, do you want to sum up? Absolutely, Your Honor. It's our position that this video has to be looked at in the totality. And the totality of the circumstances in this case show the circuit court judge was absolutely correct in finding that there was no Miranda violation here, that the statement was not coerced, but that defendant provided this confession of his own free will and it was fully voluntary. Thank you. Thank you. I'd just like to briefly make a couple points. First, in regards to the first invocation of the right to remain silent, the State argues that they said specifically that an officer asked, you know, tell me yes or no when he's indicating with the nodding and the shaking of the head. The State says that an officer says yes or no, and that suggests that there was ambiguity as to what Christopher was doing. That officer was slightly off camera and outside. The closest officer to Cronenberger was Detective Murray. Detective Murray never asked to say yes or no. He understood what Christopher was doing and moments later said, I can't force you to talk if you don't want to talk. And he failed to honor his rights. You know, Bush all but acknowledged that yes, he was informed that Christopher had invoked the right to remain silent and refused to talk. So what we have on camera, the State saying that this is a credibility contest, I would suggest that what we have on the video is a lot of evidence that goes to the credibility of the detectives, Detective Bush in particular, but all the detectives. The fact that Bush would, knowing, being told, he just invoked his right to remain silent and then come in and then start asking him, what just happened, man? And start going into the case and why won't you talk to these guys? This is your one opportunity to rewrite the script. Those sort of things, again, they undermine Bush's credibility. And irrespective of what happened outside of the videotape, what's on the videotape shows threats being made about the death penalty. They show promises of leniency. And even though some promises of leniency have not amounted to reversible error, they are certainly factors to be considered in whether or not the actual confession was voluntary and whether a Miranda waiver was voluntary. So we can't ignore them. And in the concert of all these threats, what Christopher did here, you know, certainly was the product of the coercion at the hands of the police detectives. For these reasons, we ask this Court for a person to remain. Thank you. Thank you very much both of you for the arguments that you offered before the Court today. We will be adjourned.